UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| UNITED STATES OF AMERICA, | ) | |
| --- | --- | --- |
| *Plaintiff*, | ) | |
| | ) | |
| *vs.* | ) | 1:13-cr-230-JMS-TAB-01 |
| | ) | |
| BERTON MAYS, | ) | |
| *Defendant.* | ) | |

## ORDER

Presently pending before the Court is Defendant Berton Mays' Motion to Suppress. [Filing No. 40.] Mr. Mays has been indicted with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). [Filing No. 5.] He seeks to suppress evidence recovered after what he contends was an illegal seizure in violation of his Fourth Amendment rights, as well as evidence of an inculpatory statement he later made to federal agents that he contends was taken in violation of his Fourth and Sixth Amendment rights. While various aspects of this case bring to mind images of a spider and a fly,[1] Mr. Mays' motion must be denied because he has not identified any constitutional violations. [Filing No. 40.]

## I.
### FINDINGS OF FACT[2]

On April 10, 2015, the Court held an evidentiary hearing on Mr. Mays' Motion to Suppress. [Filing No. 40.] The following are the Court's factual findings from the evidence presented at that hearing and submitted with the parties' briefs. In making the findings that follow, the Court has

---

[1] "'Will you walk into my parlour?' said the spider to a fly. (You may find you have consented, without ever knowing why.)" *United States v. Mendenhall*, 446 U.S. 544, 577 n.15 (1980) (White, J., dissenting).

[2] To the extent that any findings of fact should be considered conclusions of law, they should be deemed to be such.

considered the testimony and the demeanor of the witnesses who testified at the evidentiary hearing: Indianapolis Metropolitan Police Department ("IMPD") Officer Matthew Coffing, IMPD Officer Douglas Lepsky, and IMPD Major Thomas Kern.

Shortly before 6:00 p.m. on August 8, 2013, Officer Coffing was patrolling in his police car and came across a fight in progress involving at least three individuals near Southeastern Avenue and Villa Avenue in Indianapolis, which is an area of the city with a higher than average crime rate.[3] Mr. Mays, though present, was not involved in the fight. Officer Coffing got out of his police car to break up the fight.

Mr. Mays began to walk away, and Officer Coffing told him to stop. Mr. Mays did not stop. Officer Lepsky arrived as back up, and Officer Coffing asked him to make contact with Mr. Mays. Officer Lepsky initially followed Mr. Mays in his marked police car. As Mr. Mays proceeded north on Harlan Street, Officer Lepsky parked his police car and began to follow Mr. Mays on foot. Officer Lepsky asked Mr. Mays to stop and identify himself. With his back to Officer Lepsky, Mr. Mays continued to walk north and said over his shoulder, "Fuck you! I don't have to stop!" Officer Lepsky continued to follow Mr. Mays and asked him to stop so that he could ask him about the fight. Mr. Mays continued to curse at him and refused to stop.

---

[3] In response to Mr. Mays' argument in his reply brief that the Government had not presented sufficient evidence that the area at issue was a high-crime area, [Filing No. 50 at 1-2], the Government presented testimony from IMPD Major Kern to support that assertion. Major Kern's testimony, while perhaps unnecessary to make the point, supports the Government's argument that Mr. Mays was present in a higher-than-average crime area of Indianapolis. *See United States v. Baskin, 401 F.3d 788, 793 (7th Cir. 2005)* (specifically rejecting an invitation to adopt a standard requiring the government to "produce specific data" establishing that a location is a "high-crime area" for an inference of criminality to be drawn from a defendant's unprovoked flight). The testimony was only of limited significance, as the "high-crime area" evidence was only relevant to the extent it was known and considered by Officer Lepsky. His testimony was that the area was a "hot spot," which is slang for a high-crime area.

As Officer Lepsky got closer to Mr. Mays, he saw that Mr. Mays' hands were in his pockets. Officer Lepsky asked Mr. Mays to remove his hands from his pockets. Mr. Mays continued to walk away from Officer Lepsky, removed only his left hand from his pocket, and cursed, "Fuck you!" Officer Lepsky noticed that Mr. Mays kept his right hand in his pocket and angled his body away from Officer Lepsky in an apparent attempt to shield that side from Officer Lepsky's view. Officer Lepsky again asked Mr. Mays to remove his right hand from his pocket, and Mr. Mays again yelled "Fuck you!"

Mr. Mays suddenly stopped moving forward and began to move in a circular direction, further obstructing Officer Lepsky's view of Mr. Mays' right side. Officer Lepsky became concerned that Mr. Mays might have a weapon in his right pocket and that the situation was about to escalate into a confrontation. Officer Lepsky placed his left hand on Mr. Mays' right shoulder[4] and, shortly thereafter, saw that Mr. Mays had a gun in his right hand. Officer Lepsky radioed "Gun!" and tased Mr. Mays with his issued Taser. The gun landed on the ground a few feet away from Mr. Mays' body. The entire encounter between Officer Lepsky and Mr. Mays lasted the amount of time it took them to walk approximately one-half of a city block.

Mr. Mays was placed under arrest for resisting law enforcement and being a felon in possession of a firearm. [Filing No. 40-1.] He was read his *Miranda* rights and questioned about the

---

[4] Officer Lepsky's prior sworn accounts regarding whether he touched Mr. Mays vary, which is somewhat understandable given the quick succession of events. [*See* Filing No. 40-1; Filing No. 50-1 at 4; Filing No. 48-1 at 3.] Mr. Mays has made much of these inconsistencies in an effort to discredit Officer Lepsky. [Filing No. 50 at 1-2.] However, the Court's finding that Officer Lepsky touched Mr. Mays is actually the most favorable construction to Mr. Mays. First, the Government conceded that the touching was a seizure for purposes of the Fourth Amendment. Second, the Court finds that at no point during the encounter did Mr. Mays actually submit to Officer Lepsky's commands, so there was no other possible seizure before the gun was observed by Officer Lepsky. Based on the Court's findings, the shoulder touching is therefore the only possible seizure that could form the basis of Mr. Lepsky's motion.

gun and the fight, but he claimed not to have knowledge of either. [Filing No. 40-1 at 1; Filing No. 50-1 at 5.]

On August 9, 2013, Mr. Mays was charged in state court with Unlawful Possession of a Firearm by a Serious Violent Felon and Resisting Law Enforcement. [Filing No. 40-2.] On August 12, 2013, two federal agents with the Bureau of Alcohol, Tobacco, Firearms, and Explosives visited Mr. Mays in jail. Mr. Mays signed a waiver of his *Miranda* rights, [Filing No. 48-2], and made an inculpatory statement. Mr. Mays appeared in state court on August 13, 2013, and was appointed a public defender at that time. [Filing No. 40-2 at 1.]

On August 21, 2013, Mr. Mays was charged in federal court with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). [Filing No. 1.] A federal grand jury later indicted him of that charge, [Filing No. 5], and the state court charges against Mr. Mays were dismissed on November 14, 2013, [Filing No. 40-2 at 1-2]. Mr. Mays now moves to suppress the evidence of the firearm recovered after what he contends to be an illegal seizure, as well as evidence of the inculpatory statement he later made to federal agents.

## II.
### THE FOURTH AMENDMENT

The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures. . . ." U.S. Const. amend. IV. Generally, a warrantless search or seizure in the absence of probable cause is unreasonable. *United States v. Slone*, 636 F.3d 845, 848-49 (7th Cir. 2011). When police conduct an unreasonable search or seizure, the exclusionary rule usually vindicates the Fourth Amendment's protections by keeping out the unlawfully obtained evidence. *Id.*

# III.
## DISCUSSION

Mr. Mays seeks to suppress evidence of the firearm recovered after what he contends was an illegal seizure, as well as evidence of the inculpatory statement he later made to federal agents. [Filing No. 48.] The Government opposes Mr. Mays' motion.[5] [Filing No. 50.] The Court will address each piece of evidence in turn.

### A. Evidence of Firearm

Mr. Mays contends that Officer Lepsky did not have reasonable suspicion to believe that he was involved in any criminal activity; thus, his seizure was in violation of *Terry v. Ohio*, 392 U.S. 1 (1968). [Filing No. 40 at 2-4.] Mr. Mays emphasizes that there was no dispatch call, that he was not involved in the fight that Officer Coffing observed, and that he had every right to refuse to cooperate with Officer Lepsky's requests for information. [Filing No. 40 at 3.]

In response, the Government concedes that there was no reasonable suspicion to justify asking Mr. Mays to stop when the request was first made. [Filing No. 48 at 5.] Because Mr. Mays did not submit, however, the Government argues that no seizure occurred for Fourth Amendment purposes "until Officer Lepsky used physical force—placing his hand on Mays' shoulder—to induce Mays to stop." [Filing No. 48 at 5.] The Government argues that at that time, Officer Lepsky had reasonable suspicion that Mr. Mays was concealing a weapon and posed a threat to Officer Lepsky because he was in a high-crime area, his behavior was aggressive and evasive, he refused to show his right hand, and he shielded the right side of his body from view. [Filing No. 48 at 6-7.]

---

[5] In addition to opposing Mr. Mays' motion on the merits, the Government asks the Court to deny it as untimely. [Filing No. 48 at 4.] The Court denied that request before the evidentiary hearing when it granted Mr. Mays' Motion for Leave to File Belated Motion to Suppress. [Filing No. 52.]

In reply, Mr. Mays contends that Officer Lepsky did not have reasonable suspicion to stop him and that the fact that Officer Lepsky "harassed Mays to the point that Mays may have overreacted should not then provide justification for a *Terry* stop." [Filing No. 50 at 3.]

*1) Types of Police Encounters*

Not all interactions between police and citizens involve seizures that implicate the Fourth Amendment. *United States v. Hendricks*, 319 F.3d 993, 999 (7th Cir. 2003) (citations omitted). It is well-established that there are three categories of police-citizen encounters: 1) where an officer seeks a citizen's voluntary cooperation through non-coercive questioning, which is not a seizure within the meaning of the Fourth Amendment; 2) an investigatory *Terry* stop, which is limited to a brief, non-intrusive detention for which the officer needs specific and articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime; and 3) an arrest, for which the police must have probable cause that a person has committed or is committing a crime. *United States v. Scheets*, 188 F.3d 829, 836 (7th Cir. 1999). The encounter in this case quickly transitioned through all three categories. Because Mr. Mays does not challenge that the officers ultimately had probable cause to arrest him, the Court will only summarize the law regarding the first two categories.

With regard to the first category, "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002); *see also United States v. Hendricks*, 319 F.3d 993, 999 (7th Cir. 2004) (same). Even when officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search, as long as they do not induce cooperation by coercive means. *Drayton*, 536 U.S. at 201. "If a reasonable person

would feel free to terminate the encounter, then he or she has not been seized." *Id.* In other words, a voluntary encounter becomes a seizure when "the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Thornton*, 463 F.3d at 698 (quoting *Florida v. Bostick*, 501 U.S. 429 (1991)).

With regard to the second category, an officer may initiate a *Terry* stop when he "has a reasonable suspicion, based on specific and articulable facts, that criminal activity may be afoot." *United States v. Patton*, 705 F.3d 734, 737 (7th Cir. 2013) (citing *Terry*, 392 U.S. at 21-22). Likewise, "a police officer may take reasonable measures to determine whether a suspect is armed when the officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others." *United States v. Thomas*, 512 F.3d 383, 388 (7th Cir. 2008) (citing *Terry*, 392 U.S. at 27). "The officer need not be certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others might be in danger." *Id.* (citations omitted).

A reasonable suspicion requires more than a hunch but less than probable cause and considerably less than preponderance of the evidence. *United States v. Oglesby*, 597 F.3d 891, 894 (7th Cir. 2010). Police are permitted to rely on their experience and training in forming a reasonable suspicion. *Id.* (collecting cases). The reasonable suspicion standard is an objective one, *Patton*, 705 F.3d at 738 (citing *Terry*, 392 U.S. at 27), and the Court examines the totality of the circumstances known to the police at the time of the stop to determine whether reasonable suspicion exists, *United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003).

*2) Time of Seizure*

The Government contends that Mr. Mays was not seized until Officer Lepsky placed his hand on Mr. Mays' shoulder. [Filing No. 48 at 5.] Mr. Mays points to inconsistencies regarding whether Officer Lepsky touched him at all, [Filing No. 50 at 1-2], but he does not identify an alternate point of seizure.

The Court's "first task is to ascertain the point at which Fourth Amendment concerns became implicated." *United States v. Ford*, 333 F.3d 839, 844 (7th Cir. 2003). As the Seventh Circuit Court of Appeals has explained,

> [t]he Supreme Court [has] applied a two-part test to decide whether a person [has] been seized such that Fourth Amendment protections are triggered (whether that seizure be an arrest, a *Terry* stop, or otherwise): first, determine whether any physical force simultaneously accompanied the officer's show of authority, and second, determine whether the defendant failed to comply with that show of authority. If no physical force accompanied the show of authority and a person chose to ignore or reject that show of authority, the defendant is not seized until the officer applied physical force and the person submitted to the officer's show of authority. . . . . [U]nder this test, a fleeing suspect—even one who is confronted with an obvious show of authority—is not seized until his freedom of movement is terminated by intentional application of physical force or by the suspect's submission to the asserted authority.

*Ford*, 333 F.3d at 844 (quoting *United States v. $32,400.00, in United States Currency*, 82 F.3d 135, 138-39 (7th Cir.1996) (citing *California v. Hodari D.*, 499 U.S. 621 (1991)); *see also United States v. Griffin*, 652 F.3d 793, 798 (7th Cir. 2011) ("[A] person is seized only when, by means of physical force or a show of authority, his freedom of movement is restrained. While an officer's application of physical force always constitutes a seizure, a 'show of authority' alone is insufficient; an officer's show of authority becomes a seizure only if the person at whom it is directed actually submits to that authority. In other words, there are two kinds of seizures: those effected through physical force and those effected through a show of authority and submission to the assertion of authority.").

A "'seizure is a single act, and not a continuous fact.'" *Griffin*, 652 F.3d at 799. Thus, if a person does not submit to an officer's initial "show of authority," "the seizure does not occur until he submits to the show of authority or the pursuing officer resorts to force." *Id.* at 799-800. Consequently, an individual's incriminating actions that occur after he does not submit to an initial show of authority will not be suppressed because he was not seized at that time. *Id.* (affirming district court's decision not to suppress drugs that defendant discarded before choosing to submit to officer's show of authority for which there was not reasonable suspicion). Submission is a fact-sensitive inquiry. *See Brendlin v. California*, 551 U.S. 249, 262 (2007) ("But what may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away."). A person who briefly stops before continuing on does not submit. *$32,400.00, in United States Currency*, 82 F.3d at 138-39; *see also United States v. Mosley*, 743 F.3d 1317, 1325 (10th Cir. 2014) ("[T]o comply with an order to stop—and thus to become seized—a suspect must do more than halt temporarily; he must submit to police authority.").

Mr. Mays never submitted to any show of authority. He immediately walked away from the scene of the fight when Officer Coffing appeared, and he profanely declined Officer Lepsky's requests to engage in a consensual encounter by repeatedly cursing at Officer Lepsky as he walked away. Although Mr. Mays removed his left hand from his pocket after Officer Lepsky's request for Mr. Mays to remove both hands from his pockets, that conduct was not submission because Mr. Mays continued to walk away, curse at Officer Lepsky, and keep his right hand in his pocket. Likewise, Mr. Mays' abrupt stop was not submission because Mr. Mays continued to move in a circular motion, further shielding his pocketed right hand from Officer Lepsky's view. At that point, Officer Lepsky used physical force to stop Mr. Mays from moving by placing his hand on

Mr. Mays' shoulder, which the Court concludes is when the seizure of Mr. Mays occurred. The Court must now determine whether reasonable suspicion existed to support the seizure at that point.

*3) Reasonable Suspicion*

The Government conceded at the hearing that Officer Lepsky did not actually see Mr. Mays' gun before placing his hand on his shoulder. Instead, the Government argues that Officer Lepsky had reasonable suspicion to believe that Mr. Mays was armed and dangerous at that time because Mr. Mays was in a high-crime area, he was the only person to walk away from the fight when the officers arrived, he refused Officer Lepsky's repeated requests to turn around, he repeatedly yelled profanities at Officer Lepsky as he walked away, and although he removed his left hand from his pocket as he walked away, he refused to remove his right hand from his pocket, instead shielding his right side from view. [Filing No. 48 at 6-8.]

Mr. Mays contends that reasonable suspicion did not exist because "[a]ccording to the Government's logic, officers are permitted to continually badger citizens with requests to stop and produce identification until the person reacts, thus creating reasonable suspicion for a *Terry* stop." [Filing No. 50 at 3.] Mr. Mays emphasizes that "the Government should not be able to take a situation in which no grounds for a stop exist and then, through its own actions, create the justification." [Filing No. 50 at 3.]

It is well-established that Officer Lepsky did not need reasonable suspicion to attempt to engage Mr. Mays in a voluntary encounter. *See United States v. Thornton*, 463 F.3d 693, 698 (7th Cir. 2006) ("[A]gain, an officer does not need reasonable suspicion to attempt to engage an individual in a voluntary encounter."). And it is equally well-established that because Officer Lepsky was trying to engage Mr. Mays in a voluntary police encounter, Mr. Mays had the right to decline

that encounter. *See Florida v. Royer*, 460 U.S. 491, 497-98 (1983) ("The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds."); *see also United States v. Harris*, 188 F. App'x. 498, 501-02 (7th Cir. 2006) ("an individual has the right to decline a police encounter . . . and walking away from police can be an implicit exercise of that right"). That said, Mr. Mays' decision to leave the scene of the fight in response to Officer Coffing's presence and his repeated refusals to stop when Officer Lepsky asked him to do so can still be considered in examining the totality of the circumstances to determine if reasonable suspicion existed during the encounter. *Harris*, 188 F.App'x at 502 ("walking away quickly in the face of commands by police officers to stop is evasive behavior that contributes to the reasonableness of an officer's suspicion") (collecting cases); *see also United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003) ("Police can sometimes consider otherwise innocent behavior in determining whether reasonable suspicion exists to detain a person."); *United States v. Quinn*, 83 F.3d 917, 921-22 (7th Cir. 1996) ("Mr. Quinn gave the officer further ground to suspect him of criminal activity when he failed to yield to the officer's initial command to halt.").

Because it is undisputed that Mr. Mays was not involved in the fight that Officer Coffing observed, had Mr. Mays simply walked away and refused Officer Lepsky's requests for a consensual police encounter, there likely would not have been reasonable suspicion to justify a *Terry* stop at that point. *See Florida*, 460 U.S. at 497-98 (holding that a defendant's "refusal to listen or answer does not, *without more*, furnish those grounds" necessary for reasonable suspicion to detain him "even momentarily") (emphasis added). But Mr. Mays did more than just walk away and refuse to answer questions. Instead, he aggressively cursed at Officer Lepsky, repeatedly saying

"Fuck you!" Officer Lepsky continued to follow Mr. Mays to try to engage him in a consensual encounter, which Mr. Mays' counsel conceded at the hearing was not unreasonable or unlawful for Officer Lepsky to do. The Court agrees, given that Officer Lepsky was attempting to talk to Mr. Mays about the fight at which he was present and that the entire encounter only lasted the amount of time it took them to walk approximately one-half of a city block.

As Officer Lepsky got closer to Mr. Mays, however, he noticed that Mr. Mays' hands were in his pockets. Given Mr. Mays' recent presence at a fight and his aggressive tone toward Officer Lepsky, Officer Lepsky reasonably asked Mr. Mays to remove his hands from his pockets. Mr. Mays refused to remove his right hand from his pocket and, instead, angled his body in what appeared to be an attempt to shield his right side from Officer Lepsky's view as he continued to walk away and curse at Officer Lepsky. It was reasonable for Officer Lepsky to infer that Mr. Mays was attempting to conceal a weapon in his right pocket by angling that side of his body away from Officer Lepsky. *See Oglesby*, 597 F.3d at 893-94 (noting that defendant's "angled stance" obscuring his right side from the officers' view "made it reasonable for [the officers] to infer that [defendant's] stance was potentially calculated to keep a weapon hidden or out of reach"). Officer Lepsky again asked Mr. Mays to remove his right hand from his pocket, and Mr. Mays again yelled "Fuck you!"

At this point Mr. Mays suddenly stopped moving forward, began turning in a circular motion, and, as the Court concluded in the previous section, Officer Lepsky seized him by placing his hand on Mr. Mays' shoulder. Although it is undisputed that Officer Lepsky had not yet seen Mr. Mays' gun at that time, "*Terry* rejected the notion that an officer must be certain that an individual is armed" for reasonable suspicion to exist. *United States v. Patton*, 705 F.3d 734, 741 (7th Cir. 2013) (citing *Terry*, 392 U.S. 27). Instead, "so long as the suspicion that an individual could be

armed is supported by specific, identifiable facts, it is an objectively reasonable suspicion that satisfies *Terry*." Patton, 705 F.3d at 741 (citations omitted). Mr. Mays' presence in a higher-than-average crime area may also be factor, but "[e]ven in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion." United States v. Williams, 731 F.3d 678, 687 (7th Cir. 2013).

The Court concludes that based on an objective analysis of the totality of the circumstances, at the time Officer Lepsky seized Mr. Mays, reasonable suspicion existed to conclude that Mr. Mays might have had a weapon and been about to use physical force against Officer Lepsky. There were specific, articulable facts supporting that conclusion, such as Mr. Mays' decision to leave the scene of the fight in a higher-than-average crime area upon officer presence, his aggressive and profane refusal to talk to Officer Lepsky, his refusal to remove his right hand from his pocket, his angled stance shielding the right side of his body from Officer Lepsky's view, and his sudden stop and circular motion immediately preceding his seizure. Because the articulable facts confronting Officer Lepsky supported the inference that Mr. Mays might be armed and about to use force against him, there was reasonable suspicion to seize Mr. Mays. Thus, there was no Fourth Amendment violation, and Mr. Mays presents no reason to suppress the subsequently discovered gun.

### B. Inculpatory Statement

Mr. Mays argues that his inculpatory statement to federal agents days after he was arrested violated his Sixth Amendment right to counsel and, thus, must be suppressed.[6] [Filing No. 40 at 4.] Mr. Mays concedes that he signed a waiver of his *Miranda* rights, which he admits typically

---

[6] Mr. Mays makes an independent argument regarding the admissibility of the statement based on his contention that it should be suppressed as fruit of the poisonous tree from his allegedly unlawful Fourth Amendment seizure. [Filing No. 40 at 4.] Because the Court has concluded that Mr. Mays' seizure did not violate the Fourth Amendment, his subsequent inculpatory statement will not be suppressed on that basis.

"does the trick" under prevailing Supreme Court precedent. [Filing No. 40 at 4 (citing *Montejo v. Louisiana*, 556 U.S. 778 (2009)).]

In response, the Government acknowledges that Mr. Mays' right to counsel had attached at the time that federal agents questioned him, but it argues that no Sixth Amendment violation occurred because Mr. Mays executed a knowing, voluntary waiver of his *Miranda* rights. [Filing No. 48 at 9.] Thus, it asks the Court to deny Mr. Mays' request to suppress the statement.

"[O]nce the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings." *Montejo*, 556 U.S. at 786 (citations omitted). Interrogation is a critical stage. *Id.* That said, a defendant may waive his right to counsel "so long as relinquishment of the right is voluntary, knowing, and intelligent." *Id.* A defendant "may waive the right whether or not he is already represented by counsel" and "the decision to waive need not itself be counseled." *Id.* (citing *Michigan v. Harvey*, 494 U.S. 344, 352-353 (1990)). When a defendant is read his *Miranda* rights and agrees to waive those rights, "that typically does the trick" for purposes of waiving the Sixth Amendment right to counsel. *Montejo*, 556 U.S. at 786 (overruling *Jackson v. Michigan*, 475 U.S. 625 (1986) (holding that pursuant to the Sixth Amendment, "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid")).

The Court agrees with the Government that Mr. Mays' Sixth Amendment right to counsel was not violated when he made an inculpatory statement to federal agents after executing a waiver

of his *Miranda* rights while in custody. [Montejo, 556 U.S. at 786](). As Mr. Mays essentially concedes,[7] the United States Supreme Court foreclosed his argument by overruling prior precedent that was more favorable to his position. [[Filing No. 40 at 4]().] Thus, there is no basis presented to suppress the statement that Mr. Mays made to federal agents after executing a *Miranda* waiver days after his arrest.

## IV.
### CONCLUSION

For the reasons stated herein, the Court **DENIES** Mr. Mays' Motion to Suppress. [[Filing No. 40]().]

April 14, 2015

*[signature: Jane Magnus-Stinson]*

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only:**

Joseph Martin Cleary
INDIANA FEDERAL COMMUNITY DEFENDERS
joe_cleary@fd.org

Doris Pryor
UNITED STATES ATTORNEY'S OFFICE
doris.pryor@usdoj.gov

---

[7] The Court appreciates defense counsel's candor toward the tribunal regarding controlling precedent that is contrary to his position, as well as his specific intention to preserve an argument that such precedent should be overturned. Although all counsel have a professional obligation to disclose such authority, *see* Ind. R. of Prof. Conduct 3.3, it is unfortunately a practice that the Court sees far too infrequently.